[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 5, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-16091

_____

D.C. Docket No. 98-06118-CR-KLR

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

MAHENDRA PRATAP GUPTA,
CARDINAL CARE INC.,
MARSHAL MEDICAL SERVICES, INC.,
ATLANTIC HEALTH CARE SERVICES, INC.,
WEST COAST HEALTHCARE SERVICES, INC., and
TREASURE COAST HEALTH CARE SERVICES, INC.,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(September 5, 2006)**

Before ANDERSON, FAY and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

Individual defendant Mahendra Pratap Gupta, a private health care consultant, appeals from a criminal conviction for conspiracy to submit false claims to the United States, 18 U.S.C. § 286, and two convictions for mail fraud, 18 U.S.C. § 1341. Several corporate defendants operating as home health care agencies, Cardinal Care, Inc., Marshal Medical Services, Inc., Atlantic Health Care Services, Inc., West Coast Healthcare Services, Inc., Treasure Coast Health Care Services, Inc. (collectively the health care agencies will be referred to as "Corporate Defendants," and "Defendants" when including Gupta), also directly appeal their convictions for conspiracy to submit false cost reports to Medicare, 18 U.S.C. § 286. Allegheny Management Company, a health care consulting company, was also convicted but did not appeal.

The district court sentenced Gupta to three years' probation on each conviction to run concurrently and fined him $10,000. It sentenced Marshal Medical, Cardinal Care, West Coast, Treasure Coast, and Atlantic Health to three years' probation. It also fined Marshal Medical and Cardinal Care $1,000 each

---

[*] Honorable Eugene E. Siler, Jr., Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

but did not fine the remaining defendants because they were no longer in business. The imposed sentences also resulted in all Defendants' exclusion from Medicare programs for a period of five years. 42 U.S.C. § 1320a-7. The United States cross-appeals the validity of the sentences. For the reasons discussed below, we AFFIRM all convictions. However, we VACATE and REMAND for re-sentencing with respect to Gupta, Marshal Medical, and Cardinal Care because the court clearly erred in its application of United States Sentencing Guidelines ("USSG") §§ 3B1.1(a) and 2F1.1(b)(1).

## REGULATORY SCHEME

The Medicare program is a federal health insurance program for persons 65 years old and older and for certain disabled persons. Under the Medicare program, a home health agency may seek reimbursement for necessary reasonable costs related to patient care. Such reimbursement is administered through fiscal intermediaries – private insurance companies such as Blue Cross and Blue Shield – that contract to manage the Medicare program. Fiscal intermediaries review bills and make payments. The providers, at the end of the year, file "cost reports" seeking settlement of all annual costs.

Under the Medicare regulations, if a provider receives services from a "related" organization, its reimbursement is limited to the supplier's cost rather than the amount paid by the provider. 42 C.F.R. § 413.17 provides:

> (a) Principle . . . . [C]osts applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization . . . .
> (b) Definitions –
> (1) Related to the provider. Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.
> (2) Common ownership. Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.
> (3) Control. Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

The Provider Reimbursement Manual, published by the Health Care Financing Administration[1] ("HCFA"), explains the purpose of the "related party" regulation: "(1) to avoid the payment of a profit factor to the provider through the related organization (whether related by common ownership or control), and (2) to avoid payment of artificially inflated costs which may be generated from less than arm's length bargaining." Provider Reimbursement Manual § 1000.

---

[1]HCFA is now the Centers for Medicare and Medicaid Services.

At year end, health care agencies would submit reimbursement forms in which they answered Question A.4.a. of HCFA Form 339, the "Provider Cost Report Reimbursement Questionnaire," requiring the disclosure of goods or services purchased from a "related party." That form states:

> The provider, members of the board of directors, officers, medical staff or management personnel are associated with or involved business transactions with the following: Related organizations, management contracts and services under arrangements as owners (stockholders), management, by family relationship, or any other similar type relationship.[2]

This form is submitted to the fiscal intermediary with each cost report. In section A-6 of each cost report, the home health agencies were asked, "Are there any costs included on worksheet A which resulted from transactions with related organizations as defined in HCFA Pub. 15-1, chapter 10?" In addition, during routine audits of health care agencies, auditors inquired if there were any related party transactions as defined by Medicare regulations.

### THE PARTIES

All the Corporate Defendants except Allegheny were home health agencies, or "providers" of care to "homebound" Medicare beneficiaries. Allegheny

---

[2] Question A.4.a. does not track the regulations language and does not mention the concept of control.

5

operated as a health care management consulting firm, owned by Edward Quinlan, and provided business management consulting to the home health agencies–preparing bills, payroll, and Medicare cost reports, and supplying accounting, computer and clerical services.

## PROCEDURAL POSTURE

This case began in September 1997 when a federal grand jury in Montana returned a sixteen-count indictment against defendants Gupta, three other natural persons, Allegheny, and ten other companies involved in providing home healthcare services and supplies. In essence, the indictment charged the named defendants with having created a scheme to defraud Medicare based upon violations of the "related party" regulation by use of false claims, straw owners, and other deceptive actions to conceal the close relationship between the various persons. *See* 42 C.F.R. § 413.17.

In 1998, the case was transferred to the Southern District of Florida pursuant to Rule 21 of the Federal Rules of Criminal Procedure. The district court then severed the trial of four defendants[3] from the trial of Gupta and the six companies. After the district court dismissed thirteen counts of the indictment, the

---

[3] The government subsequently dismissed the charges against those defendants, Vijay Kumar Gupta (Mahendra Gupta's brother) and his three companies, American Home, Franklin, and Greenfield.

6

case proceeded to trial on October 25, 1999, against the remaining defendants –

Gupta, Quinlan, and Kuldeep K. Hajela, and the remaining six companies,

Allegheny, Cardinal, Marshal, Atlantic, West Coast, and Treasure Coast – on the

three remaining counts: conspiracy to submit false claims, 18 U.S.C. § 286, and

two counts of mail fraud, 18 U.S.C. § 1341.

At the close of the government's case, the district court granted defendant

Hajela's motion for a judgment of acquittal and reserved ruling pursuant to Rule

29(b) of the Federal Rules of Criminal Procedure on the motions of the remaining

eight defendants. On November 5, 1999, the jury acquitted Quinlan, but convicted

Gupta and the six companies, finding them guilty as charged.

Finally, on October 16, 2002, the district court granted the Rule 29 and 33

motions to reconsider its previous denial of their original motions for acquittal or

for a new trial.  It granted acquittals for Allegheny, Gupta, Marshal Medical,

Cardinal Care, Atlantic Healthcare, Treasure Coast Healthcare, and West Coast

Healthcare  or, in the alternative, granted a new trial.

The government appealed, arguing first that the district court had no

jurisdiction to entertain the motions for a judgment of acquittal or for a new trial

because of the time limits contained in Rules 29 and 33, and that, in any event, the

court erroneously granted the motions on the merits.  We vacated the orders as

untimely and remanded for sentencing. *See United States v. Gupta*, 363 F.3d 1169, 1176-77 (11th Cir. 2004).

## THE GOVERNMENT'S CASE

The government alleged that Gupta created Allegheny for the purpose of collecting an additional layer of reimbursable costs from the Medicare program that increases his home health agencies' reimbursable costs closer to Medicare's "cost caps." Subject to the cost caps, Medicare reimburses each home health agency for the costs necessary for the treatment of Medicare beneficiaries. As long as the consultant is not related to the agency by ownership or control, and as long as the agency acts as a prudent consumer in hiring the consultant, Medicare will reimburse the agency for the amount of its consulting contract. *See* 42 C.F.R. § 314.17. Conversely, related party contracts are not negotiated at arm's length and are treated as if the health provider is dealing with itself.

The government alleged that Gupta realized that he could make more money from Medicare if he could charge his home health agencies with consulting fees. With Quinlan's help, Gupta set up Allegheny to provide management services to help run the Corporate Defendants as home health care agencies. Under the plan, Quinlan would act as the figurehead owner of Allegheny in order to increase the

8

amount billable to Medicare. Allegheny's only employees came from one of the Corporate Defendants.[4]

The government focused on the activities occurring in Montana to demonstrate the relationship between Gupta, the Corporate Defendants, and Allegheny. In 1991, Gupta purchased another home health agency, Independent Home Health Care (IHHC), a Medicare-certified home health care agency, and arranged partly through funds obtained from Corporate Defendants, for Allegheny to effectively become a majority owner of IHHC. In addition, a non-Medicare, private pay home health agency, Independent Home Services (IHS), was sold in the same transaction.

In 1991, Gupta traveled to Montana to purchase IHHC and IHS. The total purchase price was $310,000, with $200,000 allocated for the price of IHHC and $110,000 for the purchase of IHS. On June 12, 1991, Gupta wired $80,000 from Florida to complete the payment of the purchase of IHS. IHS was purchased in Gupta's father's name, Chandra Shekhar. Gupta also arranged for his brother, Vijay Gupta, to wire $20,000 to cover part of the purchase price for IHHC. One day after wiring the $20,000 to Montana, Vijay Gupta received a check from

---

[4]As a result of this, Gupta was able to charge Medicare between $50 and $150 per hour for the employees' services as opposed to approximately $17 per hour. In the first six months of Allegheny's business operations, it billed Gupta-owned health care agencies more than $1 million for consulting.

Mahendra Gupta's wife. All compensation recited in the sales contracts for the IHHC and IHS came either directly, or indirectly, from Gupta or the Corporate Defendants.

Gupta still owed $180,000 on the purchase price of IHHC. He negotiated to hire two of the sellers of IHHC, William Anderson and Matthew Komac, to work for Allegheny. The contracts were guaranteed for $90,000 each for the remainder of 1991. The contracts specified some duties but required little more than their "being available." The employment contracts had no connection to the sales contracts even though they satisfied 90% of the purchase price for IHHC.

One week after the purchase, Allegheny was hired as IHHC's management consultant, charging between $50 and $150 per hour for services that were reimbursed by Medicare. The sellers described that they also required further assurances for payment of the $180,000. Allegheny guaranteed the fulfillment of the employment contracts with an escrow of $100,000. However, at the time the escrow was created, Allegheny did not have $100,000. Gupta and Corporate Defendants loaned Allegheny the necessary $100,000, which was used to purchase two $50,000 certificates of deposit to fund the escrow. Therefore, Allegheny guaranteed the purchase price of one of its future clients with money borrowed from Gupta.

10

On paper, a newly formed Montana corporation, Capital City Health Services, Inc., held all of the IHHC stock. It was owned by Gupta's friend, Alok Mittal, who had entrusted only $12,000 for Gupta to invest. Mittal's actions were consistent with those of a minority investor, because he left operations of Capital City entirely to Gupta. He expressed that he had no idea that Allegheny purchased most of IHHC and that he did not know anything about Allegheny. Over the years, Gupta and Allegheny billed IHHC for more than $1 million in consulting fees.

IHHC requested interim rate payments and established cash flow from Medicare. At the end of the fiscal year, IHHC reported to Medicare that it had no related party contracts to reveal. When the fiscal intermediary followed with a cost report audit, it asked IHHC if it shared any common relationship with its consultants. Consistent with its cost reports, IHHC denied any related party relationship.

In 1993, a friend of Gupta's brother, Dr. M.M. Vyas, invested $10,000 for one-third of Capital City stock and replaced Jean Komac as IHHC's administrator. Like Mittal, Vyas had no apparent knowledge that he was only a figurehead. Gupta told Vyas and Mittal that he wanted to renew the consulting contract with

11

Allegheny, and it was renewed. Mittal did not know anything about the hiring of consultants, but assented with Vyas.

Gupta ran IHHC and directed it to retain Allegheny as a consultant. In essence, Allegheny and Gupta owned IHHC. A week after the purchase, Allegheny became IHHC's management consultant, charging between $50 and $150 per hour for services reimbursable by Medicare. Gupta also became a consultant to IHHC. Vyas stated that he stayed at IHHC for a short time but wanted to leave. He expressed that he only signed paperwork to appease Gupta and get his initial investment back.

In 1994, Gupta arranged for the sale of IHHC to St. Peter's Hospital in Montana and deposited much of the proceeds from the sale to an Allegheny account. Vyas flew to Helena, Montana and attended the closing for 10 to 15 minutes and signed the necessary paperwork. Mittal stated that he did not know about the sale until after it occurred. St. Peter's Hospital paid $700,000 for IHHC and IHS. The $500,000 for IHHC was deposited into an account held by Allegheny. The remaining $200,000 was deposited to the account of the owner of IHS, Chandra Shekhar, Gupta's father. Numerous witnesses testified that Allegheny was controlled by Gupta. Witnesses described Quinlan, the owner of Allegheny's stock, as an occasional visitor to Allegheny.

12

From 1991 to 1997, Medicare reimbursed Corporate Defendants and IHHC more than $15 million in Allegheny's fees. Allegheny's client agencies were all associated with Gupta or his brother Vijay Gupta. Witnesses established that Gupta ran Marshal Medical, Cardinal Care, Atlantic Health, West Coast Health, and Treasure Coast Health. The owner of Marshal Medical and Atlantic Health was a man named Dev Raj. The owner of West Coast Health and Cardinal Care was a woman named Shanno Devi. Immigration files showed that Raj and Devi are actually Mr. and Mrs. Goyal, the in-laws of Mahendra Gupta's brother, Vijay Gupta. There is evidence that Raj and Devi were straw owners who supported Gupta in exchange for immigration assistance. The owner of Treasure Coast was a Pakistani doctor named C.D. Punwani, who was also a medical records file clerk for Cardinal Care, where she was hired upon Gupta's request.

Between 1991 and 1997, Corporate Defendants claimed reimbursement for Gupta's and Allegheny's consulting fees.[5] At the end of each fiscal year, each Corporate Defendant submitted HCFA Form 339 indicating that there were no related-party transactions with its consultants to report. In addition, each cost report included a worksheet A-6 that asked the question mentioned *supra*. If the

---

[5] Several subcontractors also take the fraud beyond Allegheny with the use of Arbors Management, a HUD housing management firm; DataMed, a computer-related subcontractor; Arbenz, an equipment rental and leasing business. Witnesses testified that Gupta used these companies to increase billing to Medicare.

13

health care agency answered "Yes," it was required to explain in detail the contractual relationship. During audits by the financial intermediary, Blue Cross and Blue Shield of Iowa, an auditor asked, "Is the owner of Independent in any way related to Allegheny?" IHHC responded that there was no relationship between the owners of IHHC and Allegheny. One estimate calculated by KPMG approximated that the fees were $3.4 million in excess of what Medicare would have paid had it known the true relationship of the parties.

## ANALYSIS

## I.  Conviction

The Corporate Defendants and Gupta present three arguments challenging their convictions:  (1) 42 C.F.R. § 413.17 does not legally support a conspiracy conviction under 18 U.S.C. § 286 because the regulation is essentially unclear;  (2) the evidence was insufficient to support a conspiracy conviction  under 18 U.S.C. § 286; and (3) Gupta's mail fraud convictions are not supported by sufficient evidence, 18 U.S.C. § 1341.

**A. The Related Party Regulation, 42 C.F.R. § 413.17, and Ownership and Control**

14

Defendants argue that as a matter of law they cannot be held liable for conspiracy to submit false claims to the government on the basis that Gupta controlled Allegheny and Corporate Defendants under the related party regulation. Defendants rely upon *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002), for the proposition that "where the truth or falsity of a statement centers on an interpretive question of law" the government must prove the statements were "knowingly and willfully false" as well as proving that the statement was untrue beyond a reasonable doubt "under any reasonable interpretation of the law." *Id.* Defendants also assert that the only allegedly false statement stems from Question A.4.a. of HCFA Form 339. On that form, the home health agencies each certified that they did not receive services from a related party by checking "no" instead of "yes" and submitting such forms between 1991 and 1997. In addition, they contend that the question from HCFA Form 339 does not define control and that Gupta's behavior is properly characterized as a controlling personality or client.

We review questions of law de novo. *United States v. McDaniel*, 338 F.3d 1287, 1288 (11th Cir. 2003). Conspiring to submit false claims to a government agency is prohibited. 18 U.S.C. § 286. Under Medicare regulations related party transactions are not prohibited; however, a provider can only be reimbursed for the actual cost incurred by the related entity. 42 C.F.R. § 413.17. Thus, "actual cost

15

must not exceed the price for which comparable services, products, or facilities could be purchased elsewhere." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir. 2004). Under the related party provision, "related to the provider" is defined as the "provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities or supplies." 42 C.F.R § 413.17(b)(1).

The indictment alleged both ownership and control theories. There is little evidence of Gupta's overt ownership of the Corporate Defendants or Allegheny. He was not a stockholder, owner, officer, director, employee, or member of Allegheny's management structure because Quinlan was listed as the owner, president, and sole stockholder of Allegheny. The government concedes that on paper the Defendants and Allegheny were owned by persons other than Gupta.

Nonetheless, control exists "if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 413.17. Control is generally viewed as a broad encompassing term. "The term 'control' includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised. It is the reality of the control which is decisive, not its

16

form or the mode of its exercise." *Kidney Ctr. v. Shalala*, 133 F.3d 78, 84 (D.C. Cir. 1998) (citing U.S. Dep't of Health & Human Services, Medicare Provider Reimbursement Manual, Part I, § 1004.3, reprinted in 1 Medicare & Medicaid Guide (CCH) P 5700 (Nov. 1994)). "Section 413.17 provides that both direct and indirect abilities to influence significantly the provider at the time of the transaction establishes control." *Sid Peterson Mem. Hosp. v. Thompson*, 274 F.3d 301, 309 (5th Cir. 2001).

While we have little case law on ownership or control under the related party regulation, the case of *Sid Peterson* provides some guidance. *Id.* In *Sid Peterson*, the Fifth Circuit upheld the Secretary of Health and Human Services's interpretation of control under the related party regulation in the context of a dispute for reimbursement under Medicare. Formal control was not required. Sufficient evidence of "ability to influence significantly the other in the bargaining process so that it could dictate the terms of the ultimate agreement" satisfied the control requirement. *Id.* The court held:

> The regulations, therefore, contemplate a fact-intensive inquiry into the relationship of the parties, logically concluding that direct control over a provider during the bargaining process could result in the continued manifestation of that control in the final agreement. In order to make the determination that the transaction is a product of a bargaining process tainted by one party's ability to control the other, the Secretary should consider "the entire body of facts and

17

> circumstances involved." U.S. Dep't of Health and Human Services, Medicare PRM, Part I, § 1004.3.

*Id*. "The Secretary has concluded that §§ 413.153 and 413.17 permit consideration of the relationship between the parties during the entire process of negotiation leading up to a transaction in determining whether the parties were related through control at the time of the transaction."  *Id.* at 311.

In fact, courts have had little trouble discerning when organizations are "related," illustrating that interpreting that term is well within the competence of the judiciary.  *See*, *e.g.*, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 509 (1994);  *Sid Peterson*, 274 F.3d at 309-11; *Monongahela Valley Hosp., Inc. v. Sullivan*, 945 F.2d 576, 591-92 (3d Cir. 1991).  Juries have convicted individuals in analogous factual settings, illustrating the term is also not beyond their interpretive abilities.  *See, e.g., United States v. Alemany Rivera*, 781 F.2d 229, 231-32 (1st Cir. 1985).

Moreover, Medicare regulations eliminate the potential for ambiguity by providing definitions for a "related organization." *See* 42 C.F.R. § 413.17(b)(1).  "Related to the provider," "common ownership," and "control" are likewise defined.  *See id.* § 413.17(b)(1)-(3); *see also Alpharma Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 939 (8th Cir. 2005) (stating that "the meaning of agency publications in the Federal Register and Code of Federal Regulations . . . is well

within the 'conventional experience of judges'"). Medicare regulations even provide examples of organizations that would be related. *See* 42 C.F.R. § 413.17(c).

With the understanding that the concepts of related party and control are clearly defined by Medicare, we examine the Defendants' claims under *Whiteside*, 285 F.3d at 1351. In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law. *Id.*; *accord United States v. Parker*, 364 F.3d 934, 944-45 (8th Cir. 2004).

In *Whiteside*, we held that the government could not meet its burden of proof to support a conviction for making a false statement in Medicare cost reports and for conspiracy to defraud the government by making false statements under 18 U.S.C. §§ 371 and 2 "where no Medicare regulation, administrative ruling, or judicial decision exists that clearly requires interest expense to be reported in accordance with the original use of the loan." 285 F.3d at 1352 (citation omitted). The specific regulation at issue governed the amount of interest to attribute to capital improvements in cost reports submitted to Medicare under 42 C.F.R. §

413.153(b)(1). If the interest was capital related, the reimbursements would have been greater.

In *Whiteside,* we reversed on the basis that the government could not prove the *actus reus* of the offenses, concluding that the defendants' interpretation that the Medicare regulations authorized the treatment of debt interest as capital-related was not unreasonable, even if the funds underlying the debt were initially used for non-capital purposes. Moreover, no authority answered the question posed and so reasonable people could differ as to whether the debt interest was capital-related. *Id.* ("'competing interpretations of the applicable law [are] far too reasonable to justify these convictions.'").

*Whiteside* differs from this case in several significant ways. First, the related party rule is well defined and there is case law discussing its application. Although control is broadly defined, it is not ambiguous: the management company and the health care provider may not be on the same side of the transaction. *See Alemany Rivera*, 781 F.2d at 231-32. Second, the holding in *Whiteside* dealt with a far more debatable application of a regulation for categorization of debt under 42 C.F.R. § 413.153(b)(1). Here, we are dealing with the concept of control over organizations. The purpose of the related party rule is not susceptible to any other interpretation. Moreover, Gupta's interpretation that

20

the related party regulation should not apply to an arguably overbearing client does not accord with "any reasonable interpretation" as set forth in *Whiteside.* There is no reasonable interpretation of 42 C.F.R. § 413.17 that would allow him to be on both sides of a transaction. Furthermore, his claim that he was an arguably overbearing client is not an interpretation of a regulation; it is a factual claim that goes to the sufficiency of the evidence.

The regulatory context demonstrates that there are no reasonable interpretations of the related party rule that render the cost reports factually accurate. The cost reports require that the provider answer the question previously discussed that refers to chapter 10. Chapter 10 effectively reiterates the related party regulation. The cost reports did not identify that services had been provided by related parties when Corporate Defendant home health agencies submitted them for payment.

Moreover, Gupta could not have misunderstood Form 339 and its reporting requirements under Medicare regulations and the related party rule. Gupta's accountant, Frank Blohm, testified that Gupta was aware of the conduct prohibited by the related party regulation. A knowing and intentional violation of the related party regulations can support a finding of criminal intent for conspiracy to submit false claims to Medicare. Form 339 Cost Report Questionnaires should not be

21

considered outside of the regulatory context to prevent inflated reimbursement requests. Gupta cannot argue otherwise by his own acknowledgment that he understood the related party transaction rules.

We hold that failing to accurately report to Medicare that a related party is providing management consulting services is actionable as a false statement under 18 U.S.C. § 286 because the related party has the ability to influence significantly the other in the bargaining process so that it could dictate the terms of the ultimate agreement. *See Alemany Rivera*, 781 F.2d at 231-32.

### B. Sufficiency of the Evidence.

We review for sufficiency of the evidence to determine whether Gupta (1) controlled the Corporate Defendants under the related party rule and (2) conspired to submit false cost reports to Medicare. Sufficiency of the evidence is a question of law that we review de novo. *United States v. Massey*, 89 F.3d 1433, 1438 (11th Cir. 1996), *cert. denied*, 519 U.S. 1127 (1997). The relevant question for a reviewing court, in judging the sufficiency of the evidence, is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict; we

22

will uphold the jury's verdict if a reasonable fact finder could conclude that the evidence establishes the Defendants' guilt beyond a reasonable doubt. *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995).

Defendants argue that the conspiracy conviction should be reversed because an agreement to submit false claims was not proven beyond a reasonable doubt. They posit that there was no agreement between Quinlan and Gupta or anyone else to defraud Medicare. In support, the Defendants highlight that no money can be traced from Allegheny to Gupta or any of the other Defendants.

This court will sustain a conviction for conspiracy to submit false claims to the United States,[6] if the government proved "the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it." *United States v. Suba*, 132 F.3d 662, 672 (11th Cir. 1998) (citing *United States v. Kammer*, 1 F.3d 1161, 1164 (11th Cir. 1993)). Conspiracy may be proven by circumstantial evidence and the extent of participation in the conspiracy

---

[6]18 U.S.C. § 286 prohibits submission of false claims to the United States:

Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both.

23

or extent of knowledge of details in the conspiracy does not matter "if the proof shows the defendant knew the essential objective of the conspiracy." *Suba*, 132 F.3d at 672 ("a common purpose or plan may be inferred from a development and collocation of circumstances"). Any differences between allegations and proof is reversible only when the defendant is actually prejudiced. *Id.* at 673.

Under these legal principles, the evidence proved an overarching conspiracy to submit false claims to Medicare concealing Gupta's controlling relationship between Allegheny and Corporate Defendants. A reasonable juror could justifiably find, beyond a reasonable doubt, that the conspiracy to submit false documents by Corporate Defendants, Gupta, and Allegheny, alleged in the indictment, was the conspiracy proven.

First, the evidence is sufficient to permit a reasonable juror to determine that Gupta controlled Allegheny under the related party regulation. The evidence established that Gupta: (1) created Allegheny; (2) managed the day-to-day affairs from his office in Allegheny; (3) directed the work of its employees; (4) had an employee of Allegheny as his secretary; (5) hired an independent contractor and other employees to work for Allegheny; (6) discussed hiring and firing an Allegheny employee; and (7) obligated Allegheny to pay IHHC through two

24

employment contracts. Moreover, there was evidence that "no one would move [at Allegheny] without M.P. [Gupta's] permission."

Second, the proof showed a connection with and control over the Corporate Defendants. Gupta hired the administrator for IHHC and hired Allegheny and himself as consultants. Gupta spoke of owning Treasure Coast and IHHC, he created West Coast Health Care, and he was in charge of Cardinal Care. He used in-laws of his brother as a front for several of Corporate Defendant home health agencies in exchange for help with immigration matters.

Third, as to conspiracy, Defendants contend that there was no express agreement between Quinlan, employees of the Corporate Defendants, and Gupta, and no circumstantial evidence from which a conspiracy could be inferred. The evidence is sufficient to establish through Gupta's, the Corporate Defendants', and Allegheny's dealings with IHHC in Montana, that a conspiracy existed between Corporate Defendants, Allegheny, and Gupta to conceal their relationship in order to submit inflated cost reports and receive Medicare reimbursement for consultation services the costs of which were not bargained for at arm's length.

Gupta and the Corporate Defendants took extraordinary steps to conceal the relationship with the financial intermediary. They used dummy employment contracts, false and misleading corporate minutes, straw owners, forged contracts,

25

backdated correspondence, and false invoices that were cosmetically altered to make them look older. The evidence was sufficient to prove that Gupta controlled both Corporate Defendants and Allegheny and conspired to submit false cost reports concealing their true relationship. *See United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006) (evidence of conspiracy does not have to be overwhelming). The government has proven Gupta's and the Corporate Defendants' awareness of the essential nature of the conspiracy and sufficient circumstantial evidence. *See United States v. Lluesma*, 45 F.3d 408, 410 (11th Cir.1995).

### C. Mail Fraud, 18 U.S.C. § 1341

Gupta generically appeals his mail fraud convictions, categorized as Counts II and III in the indictment, but provides no argument or legal support. We may decline to address an argument where a party fails to provide arguments on the merits of an issue in its initial or reply brief. Without such argument the issue is deemed waived. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n. 6 (11th Cir.1989) (deeming issue waived where party fails to include substantive argument and only makes passing reference to the order appealed from). Accordingly, we hold that the evidence was sufficient to permit a reasonable jury to conclude that Gupta conspired to submit false claims to the government. The

scheme involved two mailed checks. The jury could reasonably infer Gupta's guilty knowledge and participation in the scheme to submit false claims to Medicare from the whole of the evidence presented and strong circumstantial evidence that the checks were mailed. There was sufficient evidence to support Gupta's convictions on these counts.

## II. Government's Sentencing Cross-appeal

The district court held its first sentencing hearing in 2001 but did not impose sentence. During that time, the government introduced a sentencing memorandum. It included the expert report of Gary Young calculating a loss to Medicare of $6.19 million, which is determined by summing the amounts by which the health care consulting fees charged by Gupta and Allegheny to each of the Corporate Defendants and IHHC exceeded the costs for the services (the profit to Allegheny from the Corporate Defendants and IHHC). In October 2002, the district court granted a judgment of acquittal but we found that the motion was untimely and remanded to the district court with instructions to impose sentence. *Gupta*, 363 F.3d at 1176-77. The government filed a second sentencing memorandum that included expert reports from Jeff Litvack and Shirill Garvey. Both expert reports calculated the amount of loss to Medicare for Guidelines purposes. Garvey's report supported KPMG's calculation of loss as the profits to

Allegheny that resulted from billing the Corporate Defendants and IHHC for management fees at amounts in excess of its cost. The Litvak Report calculated the amount of loss as Allegheny's net profits from the Corporate Defendants and IHHC. Litvak reasoned that the costs of services furnished to a provider by a related party were includable in the allowable costs of the provider at the cost to the related organization. Thus, neither Corporate Defendants nor IHHC was entitled to be reimbursed by Medicare for amounts that exceeded Allegheny's cost to provide management services to them. Litvak calculated losses of $3.4 million. The government also referenced the Yong report from its first sentencing memorandum and filed a supplemental sentencing memorandum to remind the court of its prior findings.

The district court sentenced Gupta and the Corporate Defendants on November 5, 2004. During the sentencing hearing, Gupta and Corporate Defendants objected to a 14-level increase under USSG § 2F1.1(b)(1)(O) contending that the amount of loss was calculated incorrectly. The district court sustained the objection and found that the government incurred no loss. Gupta and Corporate Defendants also objected to the 2-level increase under § 2F1.1(b)(2)(A), contending that the offense did not involve more than minimal planning. The district court overruled the objection finding that it did involve

28

more than minimal planning. Gupta objected to a 4-level increase under USSG § 3B1.1(a), contending that there were not enough participants to warrant the adjustment and the offense behavior was not otherwise extensive. The district court found that the scheme was not otherwise extensive, in that it involved only the failure to check off the correct box in Question A.4.a. of HCFA Form 339.

The district court reasoned that (1) there was a $90 cap per day for services, (2) each of the Corporate Defendants was substantially below that cap, (3) when Gupta was forced to sell, a hospital took over and raised expenses substantially, (4) the government was not concerned that a home health care provider that charged less for services was replaced by one that charged more, and (5) the government had not suffered a loss, as it did not mind paying more money (at least up to the cost cap of $90 per day). The court also denied the government's request to include the Litvak loss report in the sentencing record.

The government objected to the district court's finding of no loss and the resulting lack of enhancement, contending that the loss was at least $3.4 million. The government also objected to the district court's finding that a four-level leader enhancement under § 3B1.1(a) for Gupta was not warranted after finding that the scheme was not otherwise extensive.

The district court relied on the following Guideline calculation:

29

| Offense Level: | Relevant Guideline Provision | |
|---|---|---|
| a. Base Offense Level | 2F1.1(a) | 6 |
| b. Specific Offense Characteristics: | 2F1.1(b)(1)(A) + | 0 |
| | 2F1.1(b)(2)(A) + | 2 |
| c. Adjustments: | | |
| i. Enhancements: | none | 0 |
| ii. Reductions: | none | 0 |
| Adjusted offense level: | 8 | |
| Criminal History Category | I | |
| Applicable Guideline Range (Gupta) | 0 to 6 months | |
| Departure (if applicable) | none | |

It applied two points for the more than minimal planning enhancement under USSG § 2F1.1(b)(2). All Defendants received three years probation. It fined Gupta $10,000, and Cardinal Care and Marshal Medical $1,000 each. The district court found that West Coast, Treasure Coast, Atlantic Health no longer operated as going concerns and did not fine them.

The district court stated during the sentencing hearing:

In other words, they saw that these regulations really were not comprehensive or comprehendible. And they said, Well, let's leave it that way. Let's not clarify it. Now I think they have since abolished this whole thing so it's all academic. And I am of the opinion that no

crime has been committed.  Now, you want me to sentence at the high end of this range?  No way.  I'm going to give him the low range.

Now, it may be that the 11th Circuit will decide that a crime has been committed.  But it seems to me they would have to overrule their *Whiteside* opinion to do so.  And they have that administrative opinion, the Tennessee nurse's case, which seems to me not even a criminal level.  They said it was – there was no finding of fault.

As I indicated at a prior time, it's amazing to me that somebody could be convicted of a felony based upon a bureaucratic regulation.  Now, I know you say, well, he made a false statement and/or mail fraud or something.  But these regulations were so poorly drawn and so obscure that I don't see how within either – how a jury could find an intent to defraud beyond a reasonable doubt.  So these are the factors that I'm relying upon in imposing sentence.

## A.  Leader or Organizer under § 3B1.1(a).

In its cross-appeal, the government argues that the district court erred in sustaining Gupta's objection to a 4- level enhancement under § 3B1.1(a) after finding that Gupta was not the leader or organizer of an "otherwise extensive" scheme.  The government contends that the district court failed to make the necessary inquiry as to Gupta's role in the crime given (1) the number of participants he enlisted and the extensiveness of the scheme; (2) that there were at least four knowing participants in Gupta's scheme, including Jean Komac (IHHC administrator), Al Agrawal and Lola Badillo (employees of Allegheny), and

31

Kuldeep Hajela (an acquitted co-defendant); (3) that Gupta relied upon or used, numerous unwitting participants (Mittal, Vyas, Punwani, Raj, Devi); (4) that Gupta served as both the organizer and leader of the scheme, in that he moved the money, directed the actions of the companies involved, and hired himself; and (5) that the scheme was extensive, in that it involved six home health agencies in four states submitting false cost reports between 1991 and 1997 with profits of $ 3.4 million.

This court reviews a sentencing court's determination of a defendant's role in the crime for clear error. *United States v. Ramsdale*, 61 F.3d 825, 830 (11th Cir. 1995). Section 3B1.1(a) provides, "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The commentary provides that in most instances, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *See* USSG § 3B1.1, comment. (n.2). In assessing a defendant's role in the offense, the factors the courts should consider include:

> (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

USSG § 3B1.1, comment. (n.4). "Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership." *Ndiaye*, 434 F.3d at 1304 (citing *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993)). A "participant" is defined as a "person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1.

The district court clearly erred in finding that the criminal activity was not otherwise extensive. Gupta's PSI detailed that (1) he funded and controlled Allegheny, though it was owned in name by Quinlan; (2) he ran each of the Corporate Defendants and IHHC, though they were actually owned by various straw owners; (3) Allegheny, the Corporate Defendants, and IHHC were defined as related companies under applicable Medicare regulations, as Gupta controlled each entity; (4) Allegheny provided and billed $15 million worth of consulting services to each of the Corporate Defendants and IHHC; (5) Medicare reimbursed the Corporate Defendants and IHHC; (6) as Allegheny was related to each of the Corporate Defendants and IHHC, such fees should have been limited to the costs to Allegheny of providing the services; and (7) in each cost report filed by Allegheny on behalf of the Corporate Defendants and IHHC, the Corporate Defendants and IHHC improperly failed to disclose that each was related to

Allegheny. Gupta did not object to these particular findings of fact in his sentencing memoranda or at the sentencing hearings. Therefore, such facts are deemed admitted for sentencing purposes. *See United States v. Shelton*, 400 F.3d 1325, 1330 (11th Cir. 2005) (holding that factual findings set forth in a PSI not objected to by a defendant are deemed admitted).

Contrary to Gupta's assertions, the criminal activity was quite complex and is not susceptible to simple categorization as the failure to check a box on a medicare form. *See* USSG Ch. 3, Pt. B, comment. ("The determination of a defendant's role in the offense is to be made on the basis of all [relevant] conduct within the scope of § 1B1.3."). The record shows extensive criminal activity, as it involved seven corporations, numerous straw owners, Medicare reimbursements of over $15 million, and repeated failure to disclose related party status over a seven-year period. *See United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994) (considering "factors relevant to the extensiveness determination, including the length and scope of the criminal activity in addition to the number of persons involved").

The district court did not make a finding under § 3B1.1(a) as to whether (1) Gupta had a leadership role or (2) the offense involved at least one other person who was criminally responsible. *See United States v. Mesa*, 247 F.3d 1165, 1168

34

(11th Cir. 2001); *United States v. Costales*, 5 F.3d 480, 484 (11th Cir. 1993). It addressed these related issues during the first sentencing hearing when it inquired from the government to name persons Gupta was supervising in the criminal conspiracy. The government pointed to Hajela as Gupta's front man at Allegheny, but then contended that its primary argument was that the scheme was otherwise extensive. The district court sustained Gupta's objection to the enhancement, finding that the scheme was not otherwise extensive without addressing Gupta's leadership role or whether other criminally responsible persons were involved. It was clear error for the district court not to make a finding that Gupta's criminal activity was otherwise extensive.

## B. Finding of Loss under § 2F1.1(b)(1)

The government argues that the district court erred in finding that no loss occurred. The government first contends that the district court made no finding of loss because it was of the opinion that "no crime [had] been committed." In addition, the government asserts that the amount of the loss should be determined from the applicable Medicare regulations as (1) the amounts received by Allegheny from Medicare through Corporate Defendants and IHHC for Allegheny's services less (2) the costs to Allegheny in providing such services.

Contrary to the government's argument, the district court did make a loss finding of zero. It found that the loss was determined as the amounts by which each of the Defendants and IHHC exceeded the applicable Medicare reimbursement caps, which was equal to zero as such companies operated at up to $25 million below the applicable caps. The court reasoned that this was the correct measure of loss because the government did not mind paying up to such caps, as evidenced by the fact that St. Peter's Hospital was reimbursed at a higher rate for the services of IHHC, after its purchase from Gupta.

The government prefers that loss is calculated by the following methodology: (1) the amount received by Allegheny from Medicare through the Corporate Defendants and IHHC for Allegheny's consulting services less (2) the actual costs to Allegheny in providing such services (or Allegheny's profits from the Corporate Defendants and IHHC). The defendants argue that the district court was correct or, in the alternative, that the reasonableness of the fees Allegheny charged should be used to determine the amount of loss.

As a preliminary matter, we note that USSG § 2F1.1(b)(1) has been deleted by its consolidation with § 2B1.1 as of November 2001. Nevertheless, we apply the Guidelines in application at the time of sentencing, although, in effect, there is no identifiable difference in our analysis based upon the consolidation. *United*

36

*States v. Aduwo*, 64 F.3d 626, 628 (11th Cir. 1995) ("Generally a sentencing court should apply the guidelines in effect at the time of sentencing."). Calculations of loss under USSG § 2F1.1(b)(1), involve both legal and factual issues. *Id.* We review a district court's factual findings for clear error and its application of the Guidelines de novo. *United States v. Phillips*, 413 F.3d 1288, 1292 (11th Cir. 2005). Generally, "loss is the value of the money, property, or services unlawfully taken." USSG § 2F1.1 comment. (n.8). Fraud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused. *See United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996). Furthermore, because loss is often not calculable "with precision," the district court need only "make a reasonable estimate of the loss, given the available information." USSG § 2F1.1 comment. (n.9); *Orton*, 73 F.3d at 335 (citation and emphasis omitted).

"'[L]oss' under § 2F1.1(b) is a specific offense characteristic intended to measure the actual, attempted, or intended harm of the offense." *United States  v. Munoz*,  430 F.3d 1357, 1369 (11th Cir. 2005) (citation omitted). We have identified two of the more commonly used forms of calculation: (1) the "loss to the losing victims" method; and (2) the defendant's gain or "net gain" method. *See United States v. Bracciale*, 374 F.3d 998, 1003 (11th Cir. 2004). The sentencing

37

court is in the best position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. USSG § 2B1.1, comment. (n. 3(c)). Thus generally a district court's "reasonable estimate of the intended loss will be upheld on appeal." *United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001). However, such calculation may not be mere speculation and the government bears the burden of supporting its loss calculation with reliable and specific evidence. Finally, a district court must make factual findings sufficient to support the government's claim of the amount of fraud loss attributed to a defendant in a PSI. *United States v. Martin*, No. 05-13526, 2006 WL 637837, at *3 (11th Cir. Mar. 15, 2006) (slip. op.) (citing *United States v. Cabrera*, 172 F.3d 1287, 1294 (11th Cir. 1999)).

In this case, the district court's finding of no loss is not a reasonable estimate. The district court did not apply relevant calculation as to the greater of intended or actual loss. The court's belief that no crime was committed does not nullify its duty to calculate the Guidelines loss amount. Moreover, the purpose of the related party rule is to prevent the payment of artificially inflated consulting fees. Medicare's willingness to pay up to its cost caps does not absolve Gupta from his violation of the related party regulations or from his liability for submitting false claims to Medicare. The "no harm, no foul" argument

culminating in a calculation of no loss to the government has been regarded as an insufficient rationale by which to calculate loss. *See United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995) (rejecting under Guideline § 2F1.1 a "no loss" argument; stating that the amount of defendant's gain is an available, alternative measure of estimating that loss and concluding that "[t]he dollars paid to Appellant, in other words, are dollars that were needlessly drained from the Medicare system."). The amount the Government paid in response to the false claims is an appropriate measure of damages. *Cf. United States v. TDC Management Corp.*, 288 F.3d 421, 428 (D.C. Cir. 2002). Because the district court's application of the finding of loss was clearly erroneous under § 2F1.1(b)(1), we also conclude that the fines imposed against Marshal Medical and Cardinal Care were clearly erroneous.[7]

## CONCLUSION

We AFFIRM Gupta's and the Corporate Defendants' convictions. The sentences for Gupta, Marshal Medical, and Cardinal Care are hereby VACATED and REMANDED for re-sentencing. We AFFIRM the sentences imposed on Atlantic Health, West Coast, and Treasure Coast.

---

[7]Additionally, because the district court found that Atlantic Health, West Coast, and Treasure Coast were no longer in business and thus unable to pay a fine, and the government does not contest that finding, the imposition of no fine is unchallenged.