[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 12, 2010
JOHN LEY
CLERK

No. 09-13917
Non-Argument Calendar

_____

D. C. Docket No. 08-00228-CR-ORL-22-KRS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE ROSARIO-OQUENDO,
a.k.a. Cheko,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 12, 2010)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Jose Rosario-Oquendo, through counsel, appeals his 300-month sentence for conspiracy to possess with intent to distribute more than 5 kilograms of cocaine. Rosario-Oquendo argues that the district court erred (1) in applying a 4-level role enhancement under U.S.S.G. § 3B1.1(a), and (2) in holding him accountable for more than 150 kilograms of cocaine. For the reasons set forth below, we affirm.

**I.**

Rosario-Oquendo pled guilty to conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846. A notice filed by the government set forth the following facts. In June 2007, federal and local law enforcement agents discovered that a specific drug-trafficking organization was mailing cocaine almost every week from Puerto Rico to Orlando. In the fall of 2006, Miguel Antonio Montes took charge of the organization's Orlando operations. The notice stated that Rosario-Oquendo

> worked directly with the drug trafficking organization in Puerto Rico. During telephone conversations with Montes, [Rosario-Oquendo] arranged for the distribution of cocaine from Puerto Rico to Orlando; he delivered cocaine to associates in Puerto Rico for packaging and mailing to Orlando, Florida; and he received drug proceeds from couriers sent by Montes in Orlando, including, but not limited to, indicted co-conspirators Ricardo Perlaza, Feliz Hernandez, Jorge Cortijo, Luis Cruz, Iris Pacheco, Ida Acevedo and Loanna Cortijo.

2

The government also submitted transcripts of four intercepted telephone conversations between Montes and Rosario-Oquendo.

At the plea hearing, Rosario-Oquendo admitted that the conspiracy involved 5 kilograms or more of cocaine, but disputed the government's contention that the conspiracy involved more than 150 kilograms of cocaine. The magistrate judge found that there was a sufficient factual basis for Rosario-Oquendo's guilty plea, and the district court subsequently adjudicated Rosario-Oquendo guilty.

The PSI set Rosaro-Oquendo's base offense level at 38, pursuant to U.S.S.G. § 2D1.1(c)(1), because his offense involved more than 150 kilograms of cocaine. Rosario-Oquendo received a four-level increase, pursuant to § 3B1.1(a), because he was an organizer or leader of the offense, which involved five or more participants or was otherwise extensive. He received a 3-level reduction, under § 3E1.1(a) and (b), for acceptance of responsibility, resulting in a total offense level of 39. Rosario-Oquendo's total offense level of 39 combined with his criminal history category of II yielded a guideline imprisonment range of 292 to 365 months.

Rosario-Oquendo objected to the drug amount set forth in the PSI, arguing that he should be held accountable for at least 5, but less than 15, kilograms of cocaine, rather than 150 kilograms or more of cocaine. He also objected to the

3

application of the four-level § 3B1.1(a) enhancement for his role in the offense, arguing that he was not an organizer or leader.

At the sentencing hearing, Ray Schulte, an officer with the Orange County Sheriff's Office, testified that Montes told him that Rosario-Oquendo initially shipped to Montes smaller quantities of 4 kilograms of cocaine, but eventually shipped up to 50 kilograms of cocaine per week in April and May 2007. Schulte noted that Montes and Rosario-Oquendo were engaged in transactions with one another from approximately September 2006 through June 2007. Referring to the transcript of a May 30, 2007 telephone conversation, Schulte testified that Rosario-Oquendo told Montes that he was planning to ship 10 kilograms daily, for a total of 40 to 50 kilograms of cocaine per week. Based on Schulte's investigation, these amounts were consistent with the amounts of cocaine that actually were shipped. Schulte noted that, during an intercepted conversation on June 1, 2007, Rosario-Oquendo stated that "[t]here are 60 Chanels," meaning that Rosario-Oquendo had 60 kilograms of cocaine bearing the Chanel label.

Schulte testified that Montes paid for his cocaine by sending couriers with money to Puerto Rico. These couriers included Ricardo Perlaza, Felix Hernandez, Luis Gonzalez, Aida Acevedo, Jorge Cortijo, and Luana Cortijo. Schulte stated that these couriers told him that Rosario-Oquendo would meet them at the airport

4

in Puerto Rico and give them directions while they were there. Schulte also testified that Rosario-Oquendo himself did not package and mail the cocaine, but that other people did this under Rosario-Oquendo's direction. Schulte noted that, during one telephone conversation with Montes, Rosario-Oquendo discussed sending Luis Cruz, a money courier known as "the old guy," to Boston.

Rosario-Oquendo argued that the court should not consider Schulte's testimony because it could not reasonably be assured that the information he provided was accurate. Rosario-Oquendo also argued that there was insufficient evidence to determine that he was a leader or organizer, and that he should be held accountable for less than 15 kilograms of cocaine.

The government responded that it was apparent from the transcripts of telephone conversations that Rosario-Oquendo was supplying Montes with large quantities of cocaine, as Rosario-Oquendo at once said that he was able "to move ten a day, 40 to 50 per week" and acknowledged that "he had then available 60 kilos that he had just washed." The government also noted that Rosario-Oquendo directed the activities of seven money couriers who traveled to Puerto Rico, as well as the activities of Cruz, whom he sent to Boston.

The court stated that it had heard Montes testify in other proceedings and it did not "have any reason to believe that what [Montes] had said to Mr. Schulte and what is

included in the transcripts that [the government] referred to is untrue."

The court overruled Rosario-Oquendo's objections to the PSI's factual statements and guideline calculations. It found that Rosario-Oquendo had a total offense level of 39, a criminal history category of II, and a guideline imprisonment range of 292 to 365 months. It sentenced Rosario-Oquendo to 300 months' imprisonment, to be followed by a 5-year term of supervised release.

## II.

"A district court's enhancement of a defendant's offense level based on his role as an organizer or leader is a finding of fact reviewed for clear error." *United States v. Rendon*, 354 F.3d 1320, 1331 (11th Cir. 2003). "The government bears the burden of proving by a preponderance of the evidence that the defendant had an aggravating role in the offense." *United States v. Yeager*, 331 F.3d 1216, 1226 (11th Cir. 2003). We also review for clear error the district court's factual determination of the drug quantity for which the defendant is accountable. *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005).

The Federal Rules of Evidence do not apply at sentencing. Fed.R.Evid. 1101(d)(3). Thus, hearsay may be admitted at sentencing if there are "sufficient indicia of reliability, the [district] court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence."

*United States v. Zlatogur*, 271 F.3d 1025, 1031 (11th Cir. 2001) (quotations omitted). "[T]he focus is upon the question of [the hearsay's] reliability, which must be determined on a case by case basis." *United States v. Lee*, 68 F.3d 1267, 1275 (11th Cir. 1995).

The Sentencing Guidelines provide that a four-level enhancement may be applied if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In determining whether a § 3B1.1(a) enhancement applies, the district court should consider:

> (1) exercise of decision-making authority, (2) nature of participation in the commission of the offense, (3) recruitment of accomplices, (4) claimed right to a larger share of the fruits of the crime, (5) degree of participation in planning or organizing the offense, (6) nature and scope of the illegal activity, and (7) degree of control and authority exercised over others.

*Rendon*, 354 F.3d at 1331-32 (quotation omitted); U.S.S.G. § 3B1.1, comment. (n.4). "There is no requirement that all the considerations have to be present in any one case." *United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005). However, "[s]ection 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership." *United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006). "Thus, for example,

a defendant's management of assets, standing alone, is insufficient to support an enhancement under Section 3B1.1." *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009). More than one person can qualify as a "leader" or "organizer" of a criminal conspiracy for purposes of receiving the role enhancement. *See* U.S.S.G. § 3B1.1, comment. (n.4).

The government "must establish the quantity of drugs by the preponderance of the evidence." *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993). When a conviction stems from a conspiracy charge, the defendant is responsible for the amount of drugs in all reasonably foreseeable acts done in furtherance of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B). Even if the district court does not make individualized findings, a defendant's sentence may be upheld if the record supports the amount of drugs attributed to the defendant. *Ismond*, 993 F.2d at 1499. Base offense level 32 applies to drug offenses involving at least 5, but less than 15, kilograms of cocaine. U.S.S.G. § 2D1.1(c)(4). Base offense level 38 applies to drug offenses involving 150 kilograms or more of cocaine. *Id.* § 2D1.1(c)(1).

## III.

As an initial matter, Rosario-Oquendo argues that the district court should not have considered Schulte's hearsay testimony about Montes's prior statements.

It should be noted that much of Schulte's testimony was simply his interpretation of telephone conversation transcripts or his own opinions based on his investigation, rather than testimony about what Montes had told him. Thus, this testimony did not constitute hearsay. *See* Fed.R.Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Although Schulte's testimony regarding Montes's statements constituted hearsay, Schulte's testimony showed "sufficient indicia of reliability" and was properly admitted. *See Zlatogur*, 271 F.3d at 1031. Much of Schulte's testimony, including his testimony about Montes's statements, was supported by the transcripts of the telephone conversations between Montes and Rosario-Oquendo, and the district court specifically noted that it had heard Montes testify in other related cases and found no reason to disbelieve what he told Schulte. Under these circumstances, the district court did not err in admitting and considering Schulte's testimony.

### *Role Enhancement*

The facts culled from the plea hearing and the evidence presented at sentencing provide an adequate factual basis for the four-level role enhancement. The government's notice of the factual basis for the plea stated that Rosario-Oquendo arranged for the distribution of narcotics from Puerto Rico to

9

Orlando, delivered cocaine to associates in Puerto Rico for packaging and mailing to Orlando, and received proceeds from couriers sent by Montes. Rosario-Oquendo stated at the plea hearing that the factual basis accurately described his role in the offense.

At the sentencing hearing, Schulte stated that Montes's couriers acted under Rosario-Oquendo's direction while in Puerto Rico. He identified six individuals who acted as couriers—Perlaza, Hernandez, Gonzalez, Acevedo, Jorge Cortijo, and Luana Cortijo. Furthermore, Schulte stated that an unspecified number of individuals packaged and mailed cocaine under Rosario-Oquendo's direction. Schulte also testified that Rosario-Oquendo directed Cruz, known as "the old guy," to travel to Boston in connection with the conspiracy. This testimony was directly supported by transcripts of telephone conversations, in which Montes asked about "the old guy" and Rosario-Oquendo responded that he sometimes sent him "over there to Massachusetts and stuff." Thus, the evidence presented at sentencing established that Rosario-Oquendo exerted "some degree of control, influence, or leadership" over at least seven individuals—the six named couriers and Cruz—in addition to unnamed individuals who packaged and mailed cocaine under Rosario-Oquendo's direction. *See Gupta*, 463 F.3d at 1198; *cf. United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993) (holding that the district court erred in

10

applying the four-level role enhancement where there was no evidence to establish that the defendant was more than a mere seller of narcotics).  Accordingly, the district court did not clearly err in applying the four-level § 3B1.1(a) enhancement. *See Rendon*, 354 F.3d at 1331.

*Drug Quantity*

The evidence established that Rosario-Oquendo was responsible for more than 150 kilograms of cocaine.  Schulte testified at the sentencing hearing that Rosario-Oquendo began supplying Montes with smaller quantities of cocaine in September 2006, although he eventually was shipping up to 50 kilograms of cocaine per week in April and May 2007.  As noted above, the district court properly could consider Schulte's testimony.  Furthermore, Schulte's testimony was supported by a transcript of a telephone conversation between Montes and Rosario-Oquendo, in which Rosario-Oquendo stated that he planned to ship "ten daily" for a total of "40 or 50."  Schulte noted that, through his investigation, he determined that these amounts were consistent with the amount of cocaine Rosario-Oquendo actually shipped.  Schulte also noted that Rosario-Oquendo referenced, in a conversation with Montes, 60 kilograms of cocaine bearing the "Chanel" label.  The transcripts of telephone conversations between Montes and Rosario-Oquendo verify that Rosario-Oquendo told Montes that "[t]here are 60

11

Chanels."  Adding together the 60 kilograms of cocaine bearing the Chanel label and the 40 to 50 kilograms of cocaine per week that Rosario-Oquendo shipped in April and May 2007 results in a total drug quantity of over 150 kilograms. Accordingly, based on Schulte's testimony and the telephone transcripts, the district court did not clearly err in holding Rosario-Oquendo accountable for more than 150 kilograms of cocaine.  *See Rodriguez*, 398 F.3d at 1296.

Accordingly, based on our review of the record and consideration of the parties' briefs, we affirm Rosario-Oquendo's 300-month sentence.

**AFFIRMED.**