[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11817
Non-Argument Calendar
_____

D.C. Docket No. 0:13-cr-60249-WPD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CAMILLA VANESSA GONZALEZ,
PATRICIA NATASHA ALCIME,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 26, 2015)

Before HULL, JULIE CARNES and FAY, Circuit Judges.

PER CURIAM:

A jury convicted Defendants Camilla Vanessa Gonzalez and Patricia Natasha Alcime of conspiracy to defraud the government with respect to claims, in violation of 18 U.S.C. § 286, and multiple substantive counts of theft of public money, in violation of 18 U.S.C. § 641, and aggravated identity theft, in violation of 18 U.S.C. § 1028A, all stemming from a tax fraud scheme. On appeal, Defendant Gonzalez challenges her convictions on sufficiency of the evidence grounds. Both Defendant Gonzalez and Defendant Alcime appeal their sentences. After review, we affirm Defendant Gonzalez's convictions and total sentence. We affirm Defendant Alcime's prison sentences, but vacate the district court's order of restitution and remand for the district court to recalculate the amount of restitution Defendant Alcime must pay.

## I.  FACTUAL BACKGROUND

### A.  Trial Evidence

According to the trial evidence, Defendants Gonzalez and Alcime operated Luxury Tax, a tax preparation business, with Gonzalez as the President and Alcime as the Vice President. In 2010, the Defendants each applied for and obtained preparer tax identification numbers ("PTIN"), which are required to prepare a tax return. Defendant Alcime also obtained an electronic filing identification number ("EFIN"), which is required to transmit a tax return to the Internal Revenue Service ("IRS"). For the 2010 tax year, Luxury Tax submitted 298 tax returns

2

using Defendant Gonzalez's PTIN and 92 tax returns using Defendant Alcime's PTIN.  All of these 2010 tax returns were electronically filed using Defendant Alcime's EFIN.

Almost all of the tax returns filed using the Defendants' PTINs reported similar amounts of wages (generally between $6,000 and $7,000), listed the taxpayer's occupation as "household help" or "self-employed," and claimed the same tax credits, such as the earned income tax credit, the making work pay tax credit, and the federal fuels tax credit.  Most of the returns also claimed refunds of between $2,000 and $3,000.

Defendant Alcime's returns sought a total of $166,946 in refunds, and the IRS paid out $163,391.  Defendant Gonzalez's returns sought a total of $648,733 in refunds, and the IRS paid out $1,283,858.  In total, Luxury Tax filed returns using the Defendants' PTINs seeking refunds of $815,679, and IRS paid out $1,447,249.

The reason the IRS paid out twice what Defendant Gonzalez's returns sought was largely because two tax returns each seeking refunds of $2,073 were filed in the name of Max Kidd and Allen Cramer, both of whom had already made large estimated quarterly tax payments to the IRS.  When the IRS received the fraudulent returns, the IRS refunded the quarterly payments.  In the case of Kidd, the IRS refunded $570,573, and in the case of Cramer, the IRS refunded $139,673.

3

According to the IRS's investigation, all of the resulting refunds were paid to Luxury Tax's two bank accounts or onto debit cards controlled exclusively by Defendants Gonzalez and Alcime.  Bank records indicated that none of the refund money was sent to the persons listed on the returns, but instead was used by Gonzalez and Alcime for personal expenses, such as shopping, travel, cosmetic surgery, and paying off a student loan.  For example, from August 2010 until November 2011, the IRS deposited approximately $728,00 into Luxury Tax's JPMorgan account, and $727,000 was spent.  At trial, five taxpayers whose names and social security numbers were used on the Luxury Tax 2010 tax returns, including Kidd and Cramer, testified that they were not Luxury Tax clients, did not authorize the Defendants to file tax returns on their behalf, and never received any of the refunds the IRS paid into Luxury Tax's bank accounts.

Shortly after the IRS deposited the $570,573 refund from Kidd's purported tax return into Luxury Tax's SunTrust bank account, SunTrust froze the funds due to suspicious activity.  Because Defendant Gonzalez managed to spend some of the funds, the Suntrust account balance was approximately $511,000 when it was frozen.  After the account was frozen, Defendant Gonzalez and another woman went to the bank and asked an account manager for help in accessing funds in the account.  As a result of this unusually large deposit, SunTrust contacted law enforcement, which led to the investigation into the Defendants' tax filings.

4

After a two-day trial, the jury convicted the Defendants as charged in the indictment except for two counts (Counts 8 and 12), which were dismissed at the close of the government's case. Specifically, the jury convicted both Defendants of conspiracy to defraud the government by filing false federal tax returns (Count 1). In addition, the jury convicted Defendant Gonzalez of two counts of theft of public money (Counts 2 and 3) and two counts of aggravated identity theft (Counts 4 and 5), and convicted Defendant Alcime of three counts of theft of public money (Counts 6, 7, and 9) and three counts of aggravated identity theft (Counts 10, 11, and 13). [1]

## B.    Presentence Investigation Reports

According to the presentence investigation reports ("PSI") for both Defendants, 522 tax returns were filed in 2010 using the EFIN registered to Luxury Tax. Approximately 621 tax returns were filed in 2010 using Gonzalez's PTIN, 299 of those returns using Luxury Tax's EFIN, and the other 322 returns using an EFIN registered to a company called Tax Time. Alcime's PTIN was used to file 92 tax returns, all of which were filed using Luxury Tax's EFIN. The 621 returns prepared by Gonzalez claimed $1,738,639 in refunds, and the IRS refunded

---

[1]The fraudulent tax returns filed on behalf of Kidd and Cramer using Defendant Gonzalez's PTIN were the basis of Defendant Gonzalez's two theft of public money counts (Counts 2 and 3) and two aggravated identity theft counts (Counts 4 and 5). The fraudulent tax returns filed on behalf of the other three trial witnesses—Francisco Abreu, Lisa Whyte, and Karen Morea—using Defendant Alcime's PTIN were the basis of Defendant Alcime's three counts of theft of public money (Counts 6, 7, and 9) and three counts of aggravated identity theft (Counts 10, 11, and 13).

$1,858,386.  The 92 returns prepared by Alcime claimed $222,652 in refunds, of which $203,831 were paid.

The PSIs recommended increasing both Defendants' offense levels by 16 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the loss amount was more than $1,000,000, but less than $2,500,000.  The PSIs also recommended a 6-level increase because the offenses involved 250 or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(C).

The PSI stated that the total loss to the IRS was $2,062,217, and recommended that restitution under the Mandatory Victim Restitution Act be awarded in this amount.  This amount consisted of the $1,858,386 in refunds the IRS paid as a result of Gonzalez's 621 returns, including the Tax Time returns, and the $203,831 in refunds the IRS paid as a result of Alcime's 92 returns.

## C.    Gonzalez's Sentencing

Gonzalez and Alcime were sentenced on the same day, with Gonzalez's sentencing occurring first.  Gonzalez objected to the PSI's imposition of offense-level increases based on the loss amount and the number of victims, maintaining that she was innocent and therefore not responsible for the offense conduct. Gonzalez testified, stating that her employees prepared and filed the fraudulent tax returns at Luxury Tax using her PTIN and that she was unaware of the fraud and thought the money she was withdrawing from Luxury Tax's bank accounts

constituted the fees paid for preparing the tax returns.  Gonzalez claimed that another tax preparation service called Tax Time also had used her PTIN without her permission to file tax returns.

The government responded that Gonzalez was not claiming that the loss amount was inaccurate, only that she was not guilty, but the jury had already established her guilt.  The government presented testimony from IRS Special Agent Roberto Munoz, who investigated the tax fraud scheme and testified at trial.  Agent Munoz testified, among other things, that after the jury's verdict, he ascertained that 165 taxpayers had informed the IRS that they were victims of identity theft when the Defendants submitted fraudulent tax returns purportedly on their behalf.  In evaluating those 165 tax returns, Agent Munoz determined that 41 returns were prepared by Alcime and 124 returns were prepared by Gonzalez.  As to Alcime's 41 fraudulent tax returns, the attempted fraud amount was $94,569, and the actual fraud amount was $82,521.  As to Gonzalez's 124 fraudulent tax returns, the attempted fraud amount was $290,801, and the actual fraud amount was $951,075, partly consisting of refunds for taxpayers' advance payments of anticipated tax liability.  The total actual fraud loss was $1,033,596, and no funds from Luxury Tax's bank accounts went to any of the 165 taxpayers on whose behalf it filed returns.  The government also submitted two spreadsheets reflecting the victims and the loss amounts as to Gonzalez and Alcime.  Agent Munoz stated

that the spreadsheet for Gonzalez listed "[a]ll returns prepared by Ms. Gonzalez that have been confirmed as identity theft."

In mitigation, Gonzalez argued that she had no prior offenses and had never served time in prison. As such, a short sentence would deter her from returning to criminal behavior and would protect the public.

Gonzalez personally addressed the district court, noting that she had two small children and had maintained a regular job as a supervisor for the last two years since Luxury Tax's mistakes. Gonzalez also stated that she had no training in tax preparation, and had never intended for her business to operate as a tax fraud scheme, but should have supervised her employees more closely. When the district court asked why other people would use her PTIN to prepare fraudulent tax returns when she was the one who received the refunds, Gonzalez responded, "I have no idea." After confirming with Gonzalez that she paid her tax preparers only $50 to $100 per return, the district court stated that the pattern in Luxury Tax's filed returns "just jumps out at you that this was fraudulent tax filing." The district court stated that Gonzalez was claiming she was duped by her tax preparers, but she "got all the money."

When Gonzalez continued to insist that she was unaware of the fraud while it was going on, the district court asked the government how much money went into Luxury Tax's bank accounts. The government responded, "[i]n just tax year

8

2012 and only associated with the Luxury Tax filings, not even talking about the Tax Time fraudulent filings [that also used Gonzalez's PTIN], . . . . $1.8 million was paid out and sent into these accounts that were controlled only by Ms. Gonzalez and Ms. Alcime."

The district court also confirmed with the government that it was seeking $2,062,217 in restitution. When the district court asked Gonzalez's counsel his position on restitution, he responded, "I don't believe that I can stand here and agree to any restitution amount because of the position that Ms. Gonzalez has taken."

The district court sustained Gonzalez's objection to the number of victims, but overruled her objection to the loss amount. As to the number of victims, the district court found, based on Agent Munoz's testimony, that the government had proved 50 or more victims, not the 250 or more victims stated in the PSI, and that only a 4-level increase under U.S.S.G. § 2B1.1(b)(2)(B) applied, and not the 6-level increase under § 2B1.1(b)(2)(C). As to the loss amount, the district court found that the amount of actual or intended loss was more than $1 million. Based on these findings, the district court calculated a total offense level of 26, which, with a criminal history category of I, yielded an advisory guidelines range of 63 to 78 months in prison.

In considering the 18 U.S.C. § 3553(a) factors, the district court stated that the circumstantial evidence was overwhelming that Gonzalez and Alcime had orchestrated the fraud and that it did not make sense for someone else to use Gonzalez's PTIN to commit the tax fraud, but not recoup the profits. The district court imposed concurrent 78-month sentences for the conspiracy offense in Count 1 and the theft of public money offenses in Counts 2 and 3 and concurrent 24-month sentences for the aggravated identity theft offenses in Counts 4 and 5, which were required to run consecutive to Counts 1, 2, and 3, for a total sentence of 102 months. The district court also ordered Gonzalez to pay $1.8 million in restitution, in joint and several liability with Alcime.

## D.    Alcime's Sentencing

A few minutes after Gonzalez was sentenced, Alcime's sentencing began. Alcime's attorney advised that, based on the district court's ruling during Gonzalez's sentencing, Alcime no longer objected to the number of victims involved in the offenses. The district court stated that, consistent with Gonzalez's sentencing, it would reduce the number of victims to 50, which would result in an advisory guidelines range of 63 to 78 months for Alcime.

Defense counsel clarified, however, that Alcime continued to object to the loss amount and the restitution amount. In response, the district court stated, "What I did with Ms. Gonzalez a few minutes ago was I ordered restitution in the

10

amount of $1.8 million, which was the testimony [of] how much money went into the two accounts." The district court further explained that "if $1.8 million went into the account, then more than $1 million of that was fraudulent, and the actual loss would be more than $1 million." Alcime's counsel stated that he was present and had heard the district court's ruling on Gonzalez's loss amount objection, but that Alcime's argument was that she never intended to defraud the government and was innocent. Defense counsel also pointed out that Alcime never received the $1 million actual loss amount.

The district court noted that Alcime was not present when Agent Munoz testified and summarized Agent Munoz's testimony for Alcime's benefit, as follows:

> For the reasons I set forth in Ms. Gonzalez's sentencing, I will go ahead and overrule the objection. Ms. Alcime wasn't here, so for her benefit, I will indicate that the government put on the Detective to testify that the IRS has confirmed 175 of the tax payers have indicated that they didn't file those returns and they were fraudulent returns.
>
> $1.8 million went into the accounts from the IRS. The actual loss to the IRS, which is unusual in this case, is more than the intended loss because of a couple of big windfall returns that were utilized because they had made quarterly payments, and the IRS just gave back all the money that these poor people had paid in quarterly in anticipation of it being used to offset taxes they were going to owe on April 15.
>
> They just gave all their money back, and it went directly into the accounts controlled by Ms. Alcime and by Ms. Gonzalez.

11

The district court asked if Agent Munoz should return to the stand to testify again. Defense counsel responded that Alcime did not take the same position as Gonzalez, was very apologetic and "was not going to waste the Court's time by bringing [back] the lead agent in this case to testify before the Court." Alcime argued, and the government agreed, that she was less culpable than Gonzalez because she had filed fewer returns and had withdrawn less funds from the two bank accounts.

The district court stated that, although it had originally planned to impose a sentence at the top of the advisory guidelines range, it was persuaded that she "deserve[d] a little bit of a break." After considering the § 3553(a) factors, the district court imposed concurrent 72-month sentences for the conspiracy offense in Count 1 and the theft of public money offenses in Counts 6, 7, and 9, and concurrent 24-month sentences for the aggravated identity theft offenses in Counts 10 and 11, to run consecutive to Counts 1, 6, 7, and 9, for a total sentence of 96 months. The district court also ordered Alcime to pay $1.8 million in restitution, in joint and several liability with Gonzalez.

## II.  GONZALEZ'S CONVICTIONS

In this appeal, only Gonzalez challenges her convictions on sufficiency of the evidence grounds.

### A.    Sufficiency of the Evidence

12

We review "the sufficiency of the evidence de novo, viewing all the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Sterling, 738 F.3d 228, 234 (11th Cir. 2013), cert. denied, 134 S. Ct. 2682 (2014) (quotation marks omitted). "Accordingly, the evidence will be sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Jiminez, 564 F.3d 1280, 1284-85 (11th Cir. 2009) (quotation marks omitted).

## B.    Elements of Gonzalez's Offenses

We review the elements that the government must prove to sustain Gonzalez's convictions.

To sustain a conviction for conspiracy to defraud the government with respect to claims, under 18 U.S.C. § 286, the government must prove "the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it." United States v. Gupta, 463 F.3d 1182, 1194 (11th Cir. 2006) (quotation marks omitted). The unlawful objective of a § 286 conspiracy is to defraud the federal government "by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim." 18 U.S.C. § 286.

To convict a defendant under 18 U.S.C. § 641 of theft of public government, the government must prove that (1) the money or property belonged to the government; (2) the defendant fraudulently appropriated the money or property to his own use or the use of others; and (3) the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the owner of the use of the money or property. United States v. McRee, 7 F.3d 976, 980 (11th Cir. 1993) (en banc).

To prove aggravated identity theft under 18 U.S.C. § 1028A(a)(1), the evidence must show that the defendant: (1) knowingly transferred, possessed, or used; (2) a means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c). See 18 U.S.C. § 1028A(a)(1); United States v. Barrington, 648 F.3d 1178, 1192 (11th Cir. 2011). Theft of government money, in violation of 18 U.S.C. § 641, is one of the offenses listed in § 1028A(c). 18 U.S.C. § 1028A(c)(1). "[T]he term 'means of identification' means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." Id. § 1028(d)(7). This includes any name, social security number, or date of birth. Id. § 1028(d)(7)(A).

C.    Trial Evidence

14

Here, the evidence presented at trial was sufficient to support Gonzalez's convictions for conspiracy to defraud the government, theft of public money, and aggravated identity theft.  Specifically, the government presented evidence from which a reasonable jury could find that: (1) Gonzalez ran Luxury Tax along with her co-defendant Alcime; (2) as part of Luxury Tax's business for the 2010 tax year, Gonzalez submitted 298 tax returns using her PTIN, including returns for Kidd and Cramer, and Alcime submitted 92 tax returns using her PTIN, including returns for Abreu, Whyte, and Morea;[2] (3) the resulting IRS refunds were paid into Luxury Tax's bank accounts controlled exclusively by Gonzalez and Alcime; and (4) none of the refund money was sent to the taxpayers listed on the returns, but instead was used by Gonzalez and Alcime for their own personal expenses.

As to all three types of offenses, the jury was permitted to infer that Gonzalez prepared the returns, or knew and intended them to be prepared, from the use of her PTIN and her receiving and using the proceeds.  Moreover, the testimony of Kidd, Cramer, Abreu, Whyte, and Morea that they never authorized or dealt with Gonzalez or her company, together with Gonzalez's use of her PTIN and her taking substantial proceeds of that fraud, was sufficient to allow the jury to infer that Gonzalez knowingly transferred their identifying information and

---

[2]The PSI refers to Gonzalez having filed 621 fraudulent tax returns.  Some of the returns were for Luxury Tax and others were for another tax preparation business, Tax Time.  The charges and the trial evidence concerned only the Defendants' activities at Luxury Tax.

15

intended to defraud the IRS.  Accordingly, we affirm Gonzalez's convictions for conspiracy to defraud the government, theft of public money, and aggravated identity theft.[3]

### III.   SENTENCES

### A.    Loss Calculation

Both Defendants argue that the government failed to prove that the loss amount exceeded $1 million, and thus the district court erred in applying the 16-level increase in U.S.S.G. § 2B1.1(b)(1)(I) when it calculated their respective advisory guidelines ranges.  In particular, the Defendants argue that the district court erroneously included in the loss amount the approximately $710,000 in refunded prepayments of estimated taxes made by Kidd and Cramer because those amounts were not asked for on the two fraudulent returns and were not reasonably foreseeable to the Defendants and because Luxury Tax's SunTrust account was

---

[3]Within the portion of her brief challenging the sufficiency of the evidence, Gonzalez contends that the district court's jury charge on the aggravated identity theft offense contributed to the jury's conviction on that charge.  Although Gonzalez acknowledges that the district court gave the pattern charge, Gonzalez argues, without citing supporting authority, that the jury was required to find as an element of the offense that she knew the identifying information belonged to a real person.  To the extent Gonzalez intends to raise a substantive challenge to the jury charge, her passing reference, buried in the middle of her sufficiency challenge and without citations to supporting authority, is insufficient to preserve this issue for appellate review.  See United States v. Jernigan, 341 F.3d 1273, 1284 n.8 (11th Cir. 2003); Fed. R. App. P. 28(a)(8)(A).  In any event, the district court correctly instructed the jury that the government must prove that the defendant knew that the means of identification belonged to an actual, not a fictitious, person.  Gonzalez points to no authority requiring the charge to refer to this requirement as a separate "element."

frozen before all of those amounts could be withdrawn.[4]  Approximately $511,000

was left in the frozen bank account out of the $710,000.[5]

Under § 2B1.1(b)(1)(I), if the loss attributable to the defendant exceeds

$1,000,000, but is less than $2,500,000, the defendant is subject to a 16-level

increase in his offense level.  U.S.S.G. § 2B1.1(b)(1)(I).  The Guidelines define

"loss" as "the greater of actual loss or intended loss."  Id. § 2B1.1 cmt. n.3(A).

Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the

offense," while intended loss is the "pecuniary harm that was intended to result

from the offense," even if the harm was "impossible or unlikely to occur."  Id.

§ 2B1.1 cmt. n.3(A)(i)-(ii).  "Reasonably foreseeable pecuniary harm" means

pecuniary harm that the defendant knew or, under the circumstances, reasonably

should have known, was a potential result of the offense.  Id. § 2B1.1 cmt.

n.3(A)(iv).  A participant in a conspiracy may be held responsible for the losses

resulting from the reasonably foreseeable acts of co-conspirators in furtherance of

---

[4]We ordinarily review the district court's determination of loss under the Sentencing Guidelines for clear error.  United States v. Grant, 431 F.3d 760, 762 (11th Cir. 2005).  Where the defendant raises a new legal ground for her objection on appeal, however, we review only for plain error.  United States v. Massey, 443 F.3d 814, 818-19 (11th Cir. 2006).  Here, the Defendants challenged the loss calculation based on their claimed innocence of the charged offenses, not on the ground asserted here that the actual loss amount, which was greater than the intended loss amount, was not reasonably foreseeable to them.  Thus, our review is for plain error.

[5] The government later sought forfeiture of the remaining funds in this bank account.

17

the conspiracy.  United States v. Rodriguez, 751 F.3d 1244, 1256 (11th Cir.) (quotation marks omitted), cert. denied, 135 S. Ct. 310 (2014).

While "estimates are permissible, courts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." United States v. Bradley, 644 F.3d 1213, 1290 (11th Cir. 2011) (quotation marks omitted).  "Where the amount of loss the defendant purportedly caused is at issue, the Government must support[ ] its loss calculation with reliable and specific evidence." Id. (brackets in original, quotation marks omitted).  In addition, "a district court must make factual findings sufficient to support the government's claim of the amount of fraud loss attributed to a defendant in a PSI." Gupta, 463 F.3d at 1200.  The failure to make specific factual findings constitutes clear error.  See United States v. Medina, 485 F.3d 1291, 1304-05 (11th Cir. 2007).

We find no error, much less plain error, in the district court's determination of the loss amount attributable to Gonzalez and Alcime.  According to Agent Munoz's testimony at Gonzalez's sentencing hearing, which neither Defendant has ever disputed, there was a total actual loss of $1,033,596 to the IRS as a result of the Defendants' tax fraud scheme at Luxury Tax.  This $1,033,596 amount included only the refunds: (1) that the IRS paid into Luxury Tax's bank accounts for returns Defendants Gonzalez and Alcime filed using Luxury Tax's EIFN, and (2) that the IRS was able to confirm with the listed taxpayers were the result of

18

identity theft and fraud.   The district court could reasonably rely upon this testimony to find an actual loss in excess of $1 million.

Moreover, the district court did not err in holding the Defendants liable for losses resulting from the refunds of Kidd's and Cramer's estimated tax payments. Although the government did not show that these large prepaid taxes were necessarily intended losses, it was not error to count the whole refund amounts as actual losses because, as professional tax preparers, the Defendants knew, or reasonably should have known, that some of the individuals whose identifications they used might have paid estimated taxes, and that the return of those prepaid funds by the IRS was a potential result of their fraud. See U.S.S.G. § 2B1.1, cmt. n.3(A)(iv).  In addition, the fact that the account was frozen before the Defendants were able to withdraw all of the refunds these fraudulent tax returns produced does not change the loss amount calculation for their offense conduct.  The full refunds were deposited into their bank account, and actual loss is measured by the resulting harm, not the benefit accrued to the defendant.  See id. § 2B1.1 cmt. n.3(A)(i).

For the first time on appeal, Defendant Alcime raises an additional argument—that the district court failed to make individualized findings as to the scope of the conspiracy and the losses attributable to each Defendant's conduct before holding her responsible for the entire loss amount. See Medina, 485 F.3d at 1304-05 (involving sentencing at which the district court "made no factual findings

19

as to the amount of loss" and this Court concluded that it could not "determine what factual basis was used to reach" the loss amount).

This is not a case where the district court made no underlying findings at all. Rather, Defendant Alcime argues the findings were not sufficiently particularized as to her individual conduct. We need not resolve this issue because Defendant Alcime has not shown that any error affected the outcome of the proceeding. See United States v. Rodriguez, 398 F.3d 1291, 1299 (11th Cir. 2005) (stating that under plain error review, the defendant must show that the sentencing error affected her substantial rights, which generally means she must show that the error affected the outcome of the sentencing). It is clear from the record that, in making its loss determination, the district court relied upon Agent Munoz's undisputed testimony connecting each Defendant's acts in furtherance of the tax fraud conspiracy to specific loss amounts. Moreover, the district court found at Gonzalez's sentencing that the two Defendants orchestrated the fraud scheme together and then noted during Alcime's sentencing that the two women seemed "joined at the hip doing everything together." The trial evidence supports the district court's finding, establishing that the two women operated Luxury Tax together as President and Vice President, obtained PTINs to prepare tax returns, filed fraudulent tax returns using their PTINs, directed the refunds into the same two accounts, and then used the funds for their own personal expenses. Under the

circumstances of this case, the refunds obtained by Defendant Gonzalez's fraudulent tax returns were reasonably foreseeable to Defendant Alcime, and the district court did not plainly err in attributing the entire loss amount to Alcime. See United States v. Mateos, 623 F.3d 1350, 1370-71 (11th Cir. 2010) (explaining that the district court may attribute the entire loss amount in a conspiracy to the defendant if the losses resulting from the co-conspirator's acts were reasonably foreseeable to the defendant).

For these reasons, the district court did not err in applying the 16-level increase under U.S.S.G. § 2B1.1(b)(1)(I) with respect to either Defendant.

## B.    Number of Victims

The Defendants also argue that the government failed to prove that their offenses involved at least 50 victims and thus the district court erred when it increased their offense levels on that basis.[6]

A defendant's offense level is increased by 4 levels if the offense involved 50 or more victims. U.S.S.G. § 2B1.1(b)(2)(B). For purposes of § 2B1.1, "victim" means "any person who sustained any part of the actual loss" attributed to the crime. Id. § 2B1.1 cmt. n.1. "[I]n a case involving means of identification," the term "victim" also includes "any individual whose means of identification was

---

[6]We review the district court's finding of the number of victims for clear error. United States v. Baldwin, 774 F.3d 711, 735 (11th Cir. 2014). Whether a person is a victim, however, is a legal conclusion we review de novo. United States v. Foley, 508 F.3d 627, 632 (11th Cir. 2007).

used unlawfully or without authority." Id. § 2B1.1 cmt. n.4(E). "Means of identification has the meaning given that term in 18 U.S.C. § 1028(d)(7) . . ." Id. § 2B1.1 cmt. n.1.[7]

The district court did not clearly err when it found that the Defendants' offenses involved 50 or more victims and applied § 2B1.1's 4-level increase. Although Defendants on appeal complain that only five taxpayer-victims testified at trial, the district court did not rely on this trial evidence to apply the victim enhancement. Instead, the district court based its finding that there were 165 victims on Agent Munoz's testimony at sentencing that 165 individuals had advised the IRS that Luxury Tax had used their personal information without authorization to file fraudulent tax returns. The district court's finding was not based solely upon the two spreadsheets Munoz prepared and that were introduced at the sentencing, but on Munoz's corroborating testimony that the IRS had independently confirmed that these 165 individuals were victims of the Defendants' tax fraud scheme. The district court's finding as to the number of victims was supported by sufficient evidence.

_____

[7]Because the evidence so clearly supports the victim enhancement, we need not address the government's argument that we are precluded from reviewing the 50-victim issue at all as to Defendant Alcime because her counsel affirmatively withdrew her objection to the victim enhancement when the district court indicated it would decrease the number of victims from 250 to 50, thereby lowering the offense-level increase from 6 levels to 4 levels. See United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005) (explaining that the doctrine of invited error applies when a party induces the district court into committing the alleged error by expressly waiving an objection).

**C.**     **Reasonableness of Gonzalez's Prison Sentences on Counts 1, 2, and 3**

Defendant Gonzalez argues that her concurrent 78-month sentences on Counts 1, 2, and 3, at the high end of the advisory guidelines range, are substantively unreasonable.[8]

We review the reasonableness of a sentence under the deferential abuse of discretion standard using a two-step process.  United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008).  We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively unreasonable in light of the 18 U.S.C. § 3553(a) factors and the totality of the circumstances.[9]  Id.  Because the abuse of discretion standard "allows a range of choice for the district court," we will vacate a sentence only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  United States v. Irey, 612 F.3d 1160, 1189-90 (11th Cir. 2010) (en banc) (quotation marks omitted).  The party challenging the sentence has the burden of showing that it is

---

[8]Defendant Gonzalez does not challenge the reasonableness of her concurrent 24-month sentences on Counts 4 and 5, as the district court was statutorily required to impose two-year prison terms on these counts and to run them consecutive to the sentences on Counts 1, 2, and 3. See 18 U.S.C. § 1028A(a)(1), (b).

[9]Apart from the two guidelines calculation issues already addressed, Gonzalez does not identify any other procedural error at her sentencing.

unreasonable in light of the record and the § 3553(a) factors.  United States v. Dougherty, 754 F.3d 1353, 1358 (11th Cir. 2014). [10]

Here, Defendant Gonzalez has not carried her burden to show her concurrent 78-month sentences on Counts 1, 2, and 3 are substantively unreasonable.  The district court found that Gonzalez orchestrated a fraud scheme that defrauded the government of more than $1 million and stole the identifications of, and thus victimized, hundreds of taxpayers.  Gonzalez's sentences were well below the statutory maximum of ten years, see 18 U.S.C. §§ 286, 641, and within the advisory guidelines range of 63 to 78 months, both indications of reasonableness. See United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008); United States v. Winingear, 422 F.3d 1241, 1246 (11th Cir. 2005).  Although Gonzalez's guidelines range was driven in large measure by a loss amount greater than she may have originally intended due to the two windfall refunds from Kidd's and Cramer's prepaid estimated taxes, Gonzalez promptly spent some of that money before the account was frozen and then went to the bank to try to access the remaining funds. Under the totality of the circumstances, we cannot say the district court's decision

---

[10]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

24

to impose concurrent 78-month sentences on each of these three counts was an abuse of discretion.

## D.    Defendant Alcime's $1.8 Million Restitution Award

Defendant Alcime argues that the district court clearly erred in ordering her to pay $1.8 million in restitution. The government agrees that the $1.8 million is mistaken but submits that the record supports $1,447,249 and asks for a remand for that amount. As discussed below, Alcime makes a different argument.[11]

Under the Mandatory Victim Restitution Act ("MVRA"), a district court must order a defendant convicted of an offense against property to make restitution to the victim. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). The amount of restitution must be the full amount of the victim's loss, as determined by the court. Id. § 3664(f)(1)(A). Furthermore, a restitution award must be based on the amount of the loss actually caused by the defendant's conduct. United States v. Huff, 609 F.3d 1240, 1247 (11th Cir. 2010).

Alcime challenges the restitution award, arguing that the IRS's deposits of refunds into Luxury Tax's bank accounts were not acts committed in furtherance of the conspiracy. The relevant acts of the conspiracy, however, were Alcime's

---

[11]The district court's determination of the amount of restitution is a factual finding that we review for clear error. United States v. Huff, 609 F.3d 1240, 1247 (11th Cir. 2010). Because Alcime did not challenge the restitution order in the district court, we review for plain error.

and Gonzalez's submission of the fraudulent tax returns to the IRS, not the IRS's subsequent deposit of the refunds.

Alcime also argues that the amount of restitution should have been reduced by the amount forfeited to the government. Under the MVRA, however, the district court has no authority to offset the amount of restitution owed to the IRS by the amount of funds later forfeited to the government. United States v. Joseph, 743 F.3d 1350, 1353-54 (11th Cir. 2014).

Finally, the district court did not plainly err in exercising its discretion to hold Alcime liable for the total loss amount from her fraudulent conspiracy scheme with Gonzalez. When more than one defendant has contributed to the loss of a victim, the district court has discretion to make each defendant liable for payment of the full restitution amount. See United States v. McGarity, 669 F.3d 1218, 1270 (11th Cir. 2012); 18 U.S.C. § 3664(h). Alcime contends she should be liable for a smaller amount of the loss in proportion to her relatively minor role in the conspiracy. Alcime was the Vice President of Luxury Tax and one of only two people authorized to obtain funds from Luxury Tax's JPMorgan bank account. All of the fraudulent returns were filed using the EFIN she obtained in her name, and much of the money in the JPMorgan account was spent by her debit cards on personal purchases. The record shows that Alcime substantially participated in the fraud.

As the government acknowledges, however, there is no evidence in the record that the actual loss caused by the Defendants' conduct was $1.8 million. The $1.8 million amount mistakenly used by the district court included losses resulting from refunds that Defendant Gonzalez filed in connection with another tax preparation business, Tax Time, conduct that was not part of the charged Luxury Tax conspiracy. The district court's mistake is understandable given that the PSI included the Tax Time returns in its restitution recommendation and the prosecutor repeated that number during Gonzalez's sentencing.

Because the district court clearly erred in ordering Alcime to pay $1.8 million in restitution, we vacate the district court's restitution order and remand for the limited purpose of allowing the district court to recalculate the restitution amount in Alcime's case. In that regard, the district court may consider the trial evidence that the IRS paid a total of $1,447,249 as a result of the tax returns Defendants Alcime and Gonzales filed at Luxury Tax using Alcime's EFIN and Agent Munoz's testimony at Gonzalez's sentencing that the total actual fraud loss resulting from the Luxury Tax conspiracy was $1,033,596. It is up to the district court to make the relevant fact findings about restitution in the first instance.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**